Thank you, Your Honor. My name is Peter Erhart. I'm the attorney for Mr. Powers. Mr. Powers is seated right there. Good morning. I'm not planning to reserve any time, Your Honor. All right. This is an appeal from the district court decision regarding Mr. Powers' claim under the plan of distribution for the Exxon Valdez oil spill. The plan of distribution was established by the district court. There are two issues before the court today. The first issue is a question of whether or not Mr. Powers, whether the district court correctly determined the amount that Mr. Powers should receive under the Seafoods from Alaska contract that he had. And the second issue is whether or not the district court correctly determined whether or not Mr. Powers should receive the value of a dock that he was to have a reversionary interest in from Seafoods from Alaska. Turning to the first issue, that is the Seafoods from Alaska contract, Your Honors, as the district court recognized under the plan of distribution, the critical issue is whether or not Mr. Powers participated in the fishery. If he did not participate in the fishery, for Bill 24, the plan of distribution, which the district court approved, talks about if he ceased operations altogether, didn't operate any at all during the 1989 season, he is not entitled to recover for any years under the plan except for 1989. So the critical question for the district court was whether or not Mr. Powers participated. And there's two ways that the plan defines participated. The first is, of course, whether or not he's actually operating. And the second is whether or not he's ready, willing, and able to operate. If he is willing, ready, willing, and able to operate, he is eligible for at least the years 89, 90, 94, 95 under the plan of distribution. But excluding 91, 92, 93? We acknowledge that the plan excludes 91, 92, 93. I will turn to that in a minute. The court made findings of fact. Now, my colleague argues that the findings of fact made by the court are mixed questions of law and fact. I must admit, to your honors, that it is similar to a jury or someone deciding, for example, the question of knowingly. The factors that the court looked at are things like, on page 17 of its opinion, Mr. Powers began preparations for the Kenai River dock prior to the 1989 Salmon Drift fishery. He obtained a Corps of Engineers permit. He ordered a fish pump. Those kinds of normal preparations show that he was, in fact, ready, willing, and able to operate and, therefore, participate. Not only did he make those preparations, but in addition to that, he actually operated during the 1989 season. Now, in Upper Cook Inlet, we have two fisheries. One is the drift fishery and one is the sediment fishery. And Mr. Powers actually tendered fish for the sediment fishery in 1989. The drift fishery was closed as a result of the Exxon Valdez oil spill, so he couldn't tender for that fishery, but he was ready, willing, and able to operate. An important fact is that the spill occurred in March of 1989. The fisheries in Upper Cook Inlet for salmon occurred in July. So there's a significant period of preparation where Mr. Powers was getting ready. What about the river dock, though? One of the problems I have with your argument, the city dock was clearly ready. Yes. But the river dock, the building, tables, and ice house were only half complete. That's correct, but that has to do, again, with the time frame we're looking at here. In March of 1989, when the spill occurs, he's beginning his preparations as any tenderer would to work in 1989. Then a spill happens, then he loses the contract and the dock. Nevertheless, he goes out and continues to tender for the sediment fishery by having trucks at the beach. So that would indicate, in fact, that he was going to tender. In fact, one of the interesting things is, no one disputes, as a district court stated on page 18, that Mr. Powers was a participating tender for the purposes of the 1994-95 Upper Cook Inlet salmon drift fishery. In other words, under the plan of allocation as it already exists, and this is not on appeal, it was agreed that Mr. Powers participated in 1994-95. Footnote 24 makes it clear that only if a person is driven out of business, ceases operations altogether, are they considered to be non-participating. So the district court's determination that Mr. Powers was ready, willing, and able to operate was correct, and the court should uphold that. And the district court determined that Mr. Powers was entitled to a minimum of $157,500 for each of the years under the plan that he was allowed, that is, 89, 94, and 95. And the year 90, just so we're clear, falls in a special category, that is, there must be a bona fide claim for 1990. There was good evidence that this contract existed and he was deprived of his benefits. Now if I may turn to 91, 92, and 93, Your Honor. We acknowledge that those years are excluded under the plan. And those years are excluded, if one looks carefully at the plan, because there was no lost fish harvest in those years. It was determined that the Exxon spill did not cause lost fish harvest. Therefore, as a result of the spill, an ordinary claimant, a fish tenderer who was dependent on harvesting fish, didn't lose anything as a result of the Exxon spill. Well then, counsel, what I don't understand, if 91, 92, 93 are excluded, how can you claim the full cost of the dock? The full cost of the dock and, in fact, we also claim the full contract for the years 91, 92, and 93. And the reason that we make that argument, Your Honor, is that Mr. Powers is different than an ordinary fish tenderer. The plan specifically states that it's going to allow for a case-by-case analysis. Mr. Powers' loss here is a loss of a seven-year contract and a dock. It is not dependent on harvest. It's not a typical claim within the Exxon case where somebody has, a tenderer is not receiving fish because there is no harvest. Instead, this is similar to a tort claim where you've lost the benefit of a contract or the benefit of an agreement as a result of the conduct of another party. But wasn't the contract written in such a way that it dealt with the rent that he would forego during those years? With regard to the dock, that's absolutely true. But again, we claim that the dock was lost, in fact, in 1989. That's when Seif was from Alaska backed out of the contract. So he's entitled to the full benefit of the dock in that particular year, that is, 1989. At this point, that's what I'm arguing for, Your Honor. Thank you. Can I just ask a question, though? Doesn't the plan say that in valuing tender claims, Plaintiffs' Council will consider only economic losses incurred during seasons in oiled fisheries in which harvest was lost as a result of the oil spill? The district court focused on that language, too, Your Honor, and I think that economic loss is the issue here, but it also provides that for a case-by-case analysis of each individual claimant's claim. But how do you get over the predicate? The predicate says we'll consider economic losses in which harvest was lost as a result of the oil spill, and you say in those three years there wasn't lost harvest. That's correct, Your Honor. We have to acknowledge that. There's no determination. Right. So on a case-by-case analysis, how do you get to that if you don't get over the first hurdle? We say that Mr. Powers' claim – I'm not sure we get over the first hurdle in that sense except to say that Mr. Powers' claim is not dependent on harvest. It's a claim that is the result of the loss of this contract benefit, which has nothing to do with harvest, and then we turn to the case-by-case analysis. So you're not trying to come under that provision? We're not trying to come under that. We're arguing that this is a special situation in which Mr. Powers had this loss as a result of the spill. It's not a loss that was – It's an overhang loss that just continued throughout the – each year successively because the oil spill wiped out the dock. That's all I have, Your Honors, unless there are further questions. That's okay. Thank you. If the Court please, Dave Esting. I'm appearing on behalf of Mr. Sarko in his capacity as the administrator of the Exxon Qualified Cycle Department. The fund was set up to administer under an agreement among the parties in the plan of allocation approved by the Court the collection and then distribution of the various claim categories of all of the various proceeds based on the plans of distribution. We have a tender plan here before us today. Let me start simply with the 91, 92, 93 seasons. I think Mr. Powers' argument comes on a false basis. Very simply put, from our perspective, the plan of distribution says that you will have losses only in years that accrued – accrued only in years when there was a diminution in fish output produced positively by the Exxon Valdez oil spill. Are you saying that the plan sort of categorically includes the kind of contractual losses that is being claimed here? That's not the way the plan was written. It is not your standard but-for-causation formula. It says specifically losses must be tied to and incurred in years in which there was harvest reduction resulting from the Exxon Valdez oil spill. And the evidence produced at trial and that the authors of the plan, which I'm one, relied upon was 89, 94, and 95 in the upper Cook Inlet drift salmon fishery returns, the salmon returns in those rivers. And we can find the damages to be directly connected to or occurring in those years with 950 tenders spread across the state and a large number in this category. That was a more fair and equitable way of paying people who were actually injured positively by the oil spill than everyone who had some sort of an investment that might or might not have yielded a profit, which is what we're compensating here, lost profit, as a result of the oil spill. And that was the reason behind making that constraint. Mr. Powers essentially wants to read that predicate, as Judge Fischer put it, out of this conduct. And we see no error on the part of the district court in taking the MCR, the Zimbabwe spill, formula. And we see no error in the court having not done so. This formula was approved, with the notice of Mr. Powers and all others, on August 17, 1997, with no objection. If persons thought that it was too constraining in 1997, that was the time to have come forward and objected to that formula. As to the other point on the appeal, and that is the issue of the SFA recovery and the cessation of operations versus the participation, our position is very simple. Despite the district courts having looked at the minimal facts set forth in the record and their sources, to conclude that, in fact, the very rigorous criteria set forth in the plan, which were you have to not just ready, willing, and able in a psychological sense, you have to have the physical plant and equipment on board, on the dock, or on the water, with your crew engaged, and contracts for the collection and delivery of fish. That's what's required for participation. And if one looks carefully at this record, there is no evidence that the city dock, which is what they rely upon in order to shoot one themselves into participation, there's simply nothing in the record saying the status of that city dock, other than the presumption that, well, I worked there in 87, I worked there in 88, and therefore I was going to work there in 89. But whether any of the other components of having a city dock up and ready to run, with the employees on hand, and the equipment and the totes and all those things that needed to be staged and ready to go, and contracts to tender, simply the record's devoid. The same is true with the SFA dock, of course, as Judge Nelson observed, I mean, there's a far cry from being ready and willing with the equipment on the dock and the ice maker and the totes and the tables and all those sorts of things, being on that dock ready to go in the river the dock never got built. So he was driven out of business with respect to the operation that he planned to run on the SFA in-river dock. Counsel, may I ask a question? Of course. Are you arguing we should analyze the river dock separately from the city dock? Yes, I am, Your Honor. But I don't think, the city dock has never been in dispute, but neither is there any evidence in the record that Mr. Powers was ready to tender at either place in 1989. So I think the SFA dock contract arrangement should be a separate piece, and it never came into existence. Therefore, it was a cessation, and Mr. Powers' damages should be limited to 1989. The effort to reach out at this point in the case and argue that the city dock was there, and Judge Holland reached to that at the district court as well, is just simply unsupported by the record. And our argument's no more complicated than that. In reviewing this record, there's no evidence to demonstrate that the city dock was in any way, shape, or form ready to participate. There was not much about this issue in the briefs, at least that I could find. But thank you for your answer. Thank you. Unless there's some questions, I don't have more to... I don't think so. All right. Thank you, gentlemen. It's an interesting case. We understand the stakes, and we will submit the case and decide in due course. Thank you for joining us in the last minute. It's our pleasure. We brought as good a weather as we could. We had. We'll take any credit we can get. The next case on calendar, Newby v. Sarko, is submitted. So we'll turn to the third case on calendar, Baserto v. Luna. Thank you.
judges: Nelson, Tashima, Fisher